UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
CARL FINN,
            Plaintiff,         :

                                  :

v.                              :

                                  :

NEW YORK STATE OFFICE OF MENTAL    :
HEALTH – ROCKLAND PSYCHIATRIC    :
CENTER, JEROME FORMAN, OSMOND    :
CLARKE, NIRANJANA PATEL and NEW    :
YORK STATE OFFICE OF MENTAL HEALTH,  :
            Defendants.        :
----------------------------------------------------------------x

**MEMORANDUM DECISION**

08 CV 5142 (VB)

| USDC SDNY |
| :--- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 10-6-11 |

Briccetti, J.:

       Plaintiff Carl Finn brings this action pursuant to Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e ("Title VII"), asserting claims for discrimination based on his race and color

as well as for retaliation for having opposed discriminatory practices.  Plaintiff also asserts

claims under 42 U.S.C. § 1983 for violations of his rights secured by the First, Fifth and

Fourteenth Amendments to the United States Constitution.  Now pending before the Court is

defendants' motion for summary judgment (Doc. #49), which, for the reasons set forth below, is

granted.

       The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## BACKGROUND

       The parties have submitted briefs, statements of facts, and declarations with supporting

exhibits, which reflect the following factual background.[1]

---

     [1]     Plaintiff submitted a counterstatement of facts pursuant to Local Rule 56.1.  The
vast majority of these facts are not supported by citations to admissible evidence in the record,
and the Court will disregard such facts pursuant to Fed. R. Civ. P. 56(c) and Local Civil
Rule 56.1(d).

1

## I.     The Parties

Plaintiff Carl Finn began working for defendant New York State Office of Mental Health – Rockland Psychiatric Center ("RPC") as a food-service worker 1 ("FSW") in January 2005. RPC is a mental-health facility operated by defendant New York State Office of Mental Health ("OMH"). Plaintiff's job duties included "whatever [was] needed," such as serving food to patients, washing dishes, mopping floors, and ensuring the kitchen was kept properly, although there were no specific job duties.

Defendant Jerome Forman is the Director of Human Resources at RPC and, at all relevant times, was responsible for staffing and labor issues. Defendant Osmond Clarke was a cook at RPC. Defendant Niranjana Patel is Nutrition Services Administrator 2 and was plaintiff's supervisor.

## II.    RPC's Disciplining of Plaintiff

A collective bargaining agreement governs plaintiff's employment. Article 33 of the agreement establishes procedures for imposing discipline on employees. Before imposing formal discipline on an employee, RPC must issue a Notice of Discipline ("NOD"), which may be served either personally or via certified mail. An employee may object to a proposed discipline by filing a grievance within fourteen days. When an employee objects, the grievance goes to the Bureau of Employee Relations to try to settle the matter. According to Forman, management considers whether the employee demonstrates an intention to alter his behavior and improve his performance when determining whether to settle a grievance. Management also considers the employee's tenure at RPC. If a long-tenured employee is nearing retirement age, the settlement may include a provision that the employee will retire shortly after the settlement. If a disciplinary matter is not settled, the matter may proceed to arbitration. In such a case, the

employee may forfeit his arbitration hearing if he does not pay his share of the arbitration fees.

RPC exercises progressive discipline.  When an employee first acts unacceptably, his supervisor verbally counsels him in an attempt to improve his performance.  If the employee continues to act unacceptably after having been verbally counseled, the supervisor may issue written counseling to the employee.  According to Forman, counseling is not punitive, but is meant to improve the employee's performance.  RPC generally does not impose formal discipline on an employee who has not previously undergone counseling.

### III.   Plaintiff's Work History

In his first year, as a probationary employee, Finn received two probationary reports. The first, dated August 1, 2005, indicated Finn was "verbally counseled for improper language and arguing with [a] co-worker."  The second report, dated October 6, 2005, noted "time and attendance must improve in order to pass probation."

In April 2006, Head Cook John Hoffer reported that Finn had called defendant Clarke a "house nigger."  In addition, Hoffer testified at his deposition that Finn had called Clarke a "porch monkey."  Plaintiff denies using these epithets.

In May 2006, defendant Patel began receiving complaints that plaintiff was away from his workplace, that he harassed other workers, and that he had interfered with other workers' ability to perform their duties.  In addition, Forman reported supervisors were complaining plaintiff refused to take direction and called the supervisors stupid and incompetent.  In her declaration, Patel stated Ally Parackal, who supervised plaintiff, told Patel she had warned plaintiff he was calling in sick too often on weekends.  When Parackal warned plaintiff, he replied "so what" and walked away.

Also in May 2006, while plaintiff was making sandwiches, Clarke was standing next to

3

him holding a can opener.  Plaintiff asserts that Clarke swung a large, fifty pound metal can

opener at him while they were approximately two feet apart.  Clarke did not actually touch

plaintiff with the can opener.

On July 27, 2006, David Carabello, then Deputy Director of Administrative Services, met

with plaintiff, Patel, and plaintiff's other immediate supervisors to discuss their concerns about

plaintiff's behavior.  According to Patel, Carabello explained to plaintiff RPC's zero tolerance

policy for harassment.  Plaintiff contends that this meeting involved discussions about plaintiff's

interactions with Clarke.

On August 24, 2006, Head Cook Hoffer wrote a memorandum to Patel complaining

plaintiff had entered the ingredient room without authorization.  According to Patel, to prevent

theft, only authorized personnel are permitted to enter the ingredient room; plaintiff asserts this

policy is not enforced and employees do not abide by it.  On October 12, Hoffer wrote a

memorandum complaining plaintiff had again entered the ingredient room without authorization.

In his deposition, Hoffer stated plaintiff believed he was entitled to enter the ingredient

room because he was a union representative.  According to Pamela Alexander, president of

plaintiff's union, plaintiff was never trained as an official union representative.  Plaintiff asserts

he was placed in training to become a union representative in the spring 2006.  He completed all

the tasks to do so and was never told he was not a union representative.  Being a union

representative, however, would not have permitted plaintiff to violate any RPC rules.

On August 25, 2006, Patel submitted a request for discipline against plaintiff.  At that

time, plaintiff had not received any written counseling.  On September 28, according to Patel,

Parackal (plaintiff's supervisor) complained that plaintiff refused to listen and accused her of

being corrupt when Parackal attempted to counsel plaintiff for being away from the workplace.

4

That day, Parackal wrote a written counseling statement about having attempted to counsel plaintiff.  Plaintiff did not sign the counseling statement.

The Nutrition Department holds monthly staff meetings.  RPC employees must attend such meetings and sign an attendance sheet.  For the meetings held on August 31 and October 12, 2006, plaintiff refused to sign the attendance sheet.  Plaintiff claims he did not sign the attendance sheet because he did not receive the training in question.

On October 12, 2006, Patel received a complaint that plaintiff had been missing from the dish room for an entire hour.  On that day, Hoffer complained that plaintiff had entered the ingredient room without authorization.

On one occasion in October 2006, Clarke walked towards plaintiff and "accosted" him with two metal butcher knives.  Although plaintiff claims Clarke threatened him with the knives, Clarke did not actually touch plaintiff during this incident.

On October 12, 2006, Patel called plaintiff in for a written counseling session to discuss the importance of plaintiff performing his assigned duties and listening to his supervisors.  Parackal was also present at this meeting.  Plaintiff refused to stay because, he claims, he was entitled to a union representative or witness at the meeting and none was present.  Because plaintiff left, he did not sign the counseling memorandum.  After plaintiff left, Patel edited the memorandum to include what had transpired at the meeting.  She also requested that RPC take formal disciplinary action against plaintiff and attached the previous requests for discipline.  Defendant Forman, the Director of Human Resources, then sent the memorandum to plaintiff via certified mail.

On October 26, Forman conducted a formal interrogation of plaintiff, during which he obtained information to conclude that plaintiff had called Patel a liar and had left the counseling

session without permission to do so.  Forman composed an NOD which charged plaintiff with leaving the counseling session without permission and calling his supervisors liars.  Through the NOD, Forman sought a one week disciplinary suspension without pay.

Forman gave the NOD to Patel to give to plaintiff, who refused to take it or sign an acknowledgment of receipt.  Forman then mailed the NOD to plaintiff via certified mail.  It was never resolved.

Head Cook Hoffer complained that on November 16, 2006, plaintiff refused to attend diversity training scheduled for December 21.  Plaintiff reportedly told Walter Khan, another FSW, "I am not going, that 'porch nigger' needs to go," referring to Clarke.  Plaintiff denies using this language.  Hoffer further complained that on November 20, plaintiff listened in on a conversation between Hoffer and another food service worker, claiming he was permitted to do so by dint of his role as a union representative.

On November 21, 2006, food service worker Kathy Ramcharitar complained that plaintiff had announced he was taking a day off without obtaining Ramcharitar's approval.  On November 24, a supervising electrician complained that plaintiff had blocked a hallway with carts after being told not to.  On December 4, Hoffer reprimanded plaintiff for keeping newspapers in certain drawers in the kitchen area, despite regulations prohibiting personal items being kept in the tray line and kitchen areas.  On December 7, Finn refused Parackal's request to sign the attestation sheet for security training.  That same day, nurse Thomas Kutty complained that plaintiff had been missing from the dining room.  According to Parackal, plaintiff had been missing because he had been arguing with a co-worker.  When Parackal confronted plaintiff about his absence, plaintiff called her "stupid."  In an email to Patel, Parackal stated, "I am not able to control his behaviour. I need some help."  A note from another employee indicated

6

plaintiff had raised his voice to Parackal.

On December 11, 2006, Patel concluded plaintiff was "unmanageable."  She therefore requested his termination.

## IV.     Events Leading to Plaintiff's Termination

On December 17, 2006, Forman was informed that plaintiff had physically threatened Osmond Clarke and Sunny Nellikuzhiyil, which necessitated the Safety Department to respond. The Safety Department took statements from each actor and witnesses.  According to Nellikuzhiyil, plaintiff was supposed to work with him to transport food carts.  When Nellikuzhiyil asked plaintiff where he was, plaintiff responded by cursing and telling Nellikuzhiyil to "meet me at 2 o'clock."  Plaintiff charges Nellikuzhiyil was yelling and speaking to him in a disrespectful manner and denies cursing at and threatening Nellikuzhiyil. According to a statement from Georgina Torrance Wise, who witnessed the incident, Nellikuzhiyil appeared frightened because plaintiff had threatened him.[2]  Both Clarke and Nellikuzhiyil filed criminal complaints against plaintiff.

Plaintiff did not provide any substantive account of this event to the Safety Department. Rather, in a statement, plaintiff wrote:

> As usual these evil devils of Satan under the direction of Jim Bopp
> Dir. R.P. C. and Jerry Forman Dir of Personnell [sic] & Human
> Resources II, And chief devil N. Patel & crooked corrupt
> Incompetent Kitchen Staff of Snitches and Smater under "Patel"
> direction and, condoning in conspiracy with all mentioned above and
> further with the direct intimidation by O. Clarke, Ally Snetse
> Parack[a]l and last but not least of these low-lifed scum John Hoffer,
> I Carl Finn depose and say that after six months as me Being Union
> representative and since becoming I've been intimidated day in day

---

[2]     Plaintiff asserts Wise admitted she was pressured by management into making this statement.  Plaintiff's statement is hearsay, and the Court will not rely upon it.

out by all mentioned above. And the reason is as simple as day and night- These evil being corrupt disciples of Satan is trying to make me react by provocation on their part. So it will appear as though Jimmy Forman would be right to terminate me. But it's too late, All you devils are now exposed and the wrath of G-d is at hand.

Yes, I've come forward with the evil people here at RPC, and their evil schemes and discrimination. And I have witnesses! So Let's see who's right and who's wrong "me" or them. – C. Finn

Around one o'clock that day, Hoffer asked plaintiff to come into his office for a counseling session and asked Clarke to participate as well. According to Clarke, at the meeting, plaintiff called him a "house nigger" and a "porch monkey" and further said, "you need to shut up and let somebody else talk now. You are a house nigger; you don't think for yourself; your brain is too small." Clarke testified at his deposition that plaintiff threatened to fight him outside. According to plaintiff, as he walked into Parackal's office, Clarke called him a "punk" and told him "motherfucker, I'm going to kick your ass." Before Hoffer was present, according to plaintiff, Clarke threatened to "get [plaintiff] fired and "fuck [plaintiff] up."

## V.    The Flyers

On December 18, 2006, plaintiff posted flyers in approximately five places around the PRC campus. In the "to" line, the flyers stated "N.Y.S. employees . . . , Kitchen, and Afro-Americans." The flyers stated in typed font:

I'm writing these few words of truth and righteousness in the hope that we all will finally stand up and do the right thing – expose these corrupt, cowardly discriminating racist[s], who scheme their evil schemes against our people, and deprive us of our reaching our highest potential and N.Y.S. benefits here at R.P.C. Racism is rampant here at this institution, and management is just as much a part of it and [its] evil as those who practices it. Their [sic] is a double standard here when it comes to treating all N.Y.S. employees equally. Afro-American employees are not afforded the same equal benefits as our white and indian counterparts. We are the first fired and the last hired- in the food service dept. [T]he administrator has

8

> been keeping our people on part time status for up to 1 to 5 years,
> before they are even considered for full time, but at the same time she
> has been given the o.k. to discriminate against us black people by her
> superiors , who have sat back and conspired with her in their illegal
> and discriminative activities against our people. I know that their
> [sic] are many of us on this institution who can identify with what
> [I'm] saying . . . .

Finn continued, calling Forman a "racist coward[ ]" and referring to management as the "lowest

scum of the planet . . . ."  Finn warned that "they shall reap what they sew [sic]."  Below the

typed section was a handwritten section which included the phone number for the Rockland

County NAACP.  At his deposition, plaintiff stated he believed his statements were protected by

the First Amendment and were appropriate.

Forman was concerned the flyers invited people to not perform their jobs and to foment

violence.  James Gewirtzman, then-Director of Administrative Services, testified he was

concerned about Finn's language in the flyers.  The Safety Department removed all the flyers.

On December 18, Forman met with Gewirtzman and others to discuss safety concerns

concerning employees.  That day, RPC placed plaintiff on administrative leave and commenced

a disciplinary investigation.  While on administrative leave, plaintiff continued to receive his full

salary.

**VI.    The Disciplinary Investigation and Plaintiff's Termination**

Lawrence Decker of OMH's Bureau of Employee Relations was in charge of the

disciplinary investigation.  Decker collected statements from individuals and their files, which

contained numerous complaints about plaintiff that had occurred over several months.  In a

written statement, Clarke stated he had seen plaintiff using RPC's copy machine to make copies

of his flyer.  On January 25, 2007, Decker attempted to question plaintiff.  Plaintiff, however,

refused to answer Decker's questions because plaintiff believed the pending NOD meant the

interrogation violated his collective bargaining agreement. According to Decker, plaintiff said to him, "you will shut your mouth and listen to me." Plaintiff walked out of the interrogation.

After the interrogation, Forman and others concluded that plaintiff had exhibited a long pattern of misconduct and concluded nothing would alter his behavior. Forman drafted another NOD charging plaintiff with 23 counts of misconduct and seeking plaintiff's termination. Forman sent the NOD to plaintiff via certified mail. Executive Director James Bopp determined the NOD would be a suspension NOD, placing plaintiff on immediate disciplinary suspension without pay.

Plaintiff filed a grievance to the NOD and sought arbitration as he was allowed to do under the collective bargaining agreement. Plaintiff failed to pay the required $800 in arbitration fees. On August 21, 2007, Disciplinary Panel Administrator Linda Ronda wrote a letter to plaintiff, copying Forman, permitting RPC to terminate plaintiff in light of his failure to pay the fees. On August 28, plaintiff was terminated.

Apart from providing statements, Clarke played no role in plaintiff's termination. Clarke had no authority to terminate anyone. Clarke took a leave of absence in 2010 and thereafter retired without returning to work.

Forman had no power to terminate plaintiff himself.

## VII. Plaintiff's Complaints of Discrimination and Unsafe Food Issues

Plaintiff made numerous complaints to his immediate supervisors and management concerning alleged discriminatory practices against African American employees. Plaintiff testified he complained about his treatment by Clarke, rotten food, preferential treatment afforded to Indian employees, and overtime and hiring practices. Because of plaintiff's "demeanor, obnoxiousness, and loud cursing, belligerent," Clarke feared that plaintiff would

10

attack him.

In September 2006, plaintiff attended a meeting with Patel, union president Alexander, and others regarding RPC's overtime practices. In December 2006, plaintiff attended a meeting which Clarke also attended, at which Clarke perceived plaintiff to be belligerent and rambling.

On October 12, 2006, plaintiff filed a grievance with his union. Forman could not understand it, but saw that it contained the word "racism." Forman forwarded the grievance to Mary Wells-Stott, the Affirmative Action Coordinator, who met with plaintiff in October 2006. After their meeting, Stott reviewed notes received from plaintiff and determined he was complaining that the Nutrition Department favored Indian employees over black employees with respect to overtime.

At a second meeting, Stott asked plaintiff to clarify his allegations; plaintiff refused to do so. Plaintiff was concerned because he had seen Stott and Forman interacting prior to the meeting. As plaintiff turned to leave his meeting with Stott, Stott asked him to accompany her to Forman's office. When plaintiff objected to Stott and Forman interacting, arguing that Stott was being prejudiced by her communications with Forman, Forman explained to plaintiff that their jobs sometimes required contact.

Stott reviewed the overtime book and compared the overtime and extra time worked by black and Indian employees. She found that part-time black employees actually worked more extra time than part-time Indian employees by a measure of total hours worked and on a per employee basis. She further found that full-time black employees worked overtime more often and for more hours than full-time Indian employees. Although Indian employees worked more overtime than black employees on an hours per employee basis, Stott believed this difference to be insignificant. Stott therefore concluded there was no discrimination.

On October 13, 2006, plaintiff complained to Clarke and others that patients were being served food that had expired or was rotten, or served food in insufficient quantities. Clarke found plaintiff's complaint to be "loud, disrespectful, using profanity, and threatening." Clarke testified plaintiff's ranting about these complaints lasted 35 to 40 minutes. Plaintiff denies ranting about this. Clarke determined the food was fresh.

In response, Patel, Clarke, and others met with plaintiff. They explained to plaintiff how procedures prevented theft and ensured food safety. When plaintiff became loud and disrespectful, the meeting ended.

Sometime in 2006 or 2007, plaintiff applied for a promotion to a position of Mental Health Therapy Aide. Plaintiff was invited to interview for the position on January 30, 2007. When determining whom to hire, the director of nursing may consider the applicant's qualifications. Plaintiff's sole qualification was his test score, which Forman's assistant believed was too low to warrant a promotion. Plaintiff's interview occurred in 2007, after the events that led to plaintiff's disciplinary suspension.

## VIII.  Comparators

Plaintiff attempts to demonstrate pretext through the use of comparators. The Court will therefore introduce the relevant factual backgrounds concerning each comparator.

### A.      Osmond Clarke

As noted above, Clarke was a cook at RPC. He was issued a notice of discipline on January 16, 2001, stating he had pushed another employee into a wall on October 25, 2000. The notice also indicated Clarke had been involved in a separate violent incident with another employee. On November 22, 2000, Clarke acted in an "inappropriate and threatening" manner towards another employee by pulling the employee by his arm and cursing at him. Clarke

received a four-week suspension without pay for these acts.

Patel issued a counseling memorandum to Clarke on August 27, 2001, instructing Clarke to control his temper. In a performance evaluation covering the period from March 30, 2003, to March 30, 2004, Patel stated that Clarke "needs to communicate with employees in a calm and respectful manner without raising his voice." On March 6, 2006, Patel issued Clarke a counseling memorandum for being abrupt and not courteous during a telephone call.

On August 25, 2006, Patel issued a counseling memorandum concerning events on May 14, in which Clarke had incidents with two staff members. On November 28, 2007, Packaral issued a counseling memorandum to Clarke for yelling and screaming at her in front of other staff and supervisors. In an evaluation dated September 9, 2008, it was recommended that Clarke take anger management classes. A later counseling memorandum warned Clarke about addressing Khan in a taunting and sarcastic manner.

### B.     Gregory Pittinger

Gregory Pittinger ("Gregory") was a mason/plasterer in RPC's Plant Facilities Department. Gregory was counseled for conduct which prevented the Maintenance Department from operating properly. On May 23, 2002, a notice of discipline against Gregory sought a two-week disciplinary suspension without pay for insubordinate acts. Gregory was later issued a counseling memorandum for accusing a supervisor of failing to take action because another employee was black.

Gregory received a notice of discipline because on December 12, 2003, he interrupted a conversation between a supervisor and another employee in a loud and aggressive manner; on December 18, he acted in an "inappropriate, insubordinate and threatening" manner toward a supervisor; and on January 8, 2004, he acted in an "inappropriate, menacing manner" to a nurse.

13

Although the notice of discipline sought a four-week suspension, Gregory received a letter of reprimand, forfeited of seven days of vacation time, and was required to attend an anger/behavioral management program.

On May 6, 2005, Gregory received a memorandum accusing him of questioning and harassing maintenance staff. He was also warned not to enter into other shops or buildings without permission.

On February 13, 2006, Gregory received a notice of discipline accusing him of refusing to perform his duties, leaving his work site without permission, and threatening superiors. The notice sought Gregory's termination. Instead, he was required to serve a twelve-month Disciplinary Evaluation Period and lost six days of annual leave.

### C.     Mark Pittinger

Mark Pittinger ("Mark") was a carpenter in the plant facilities department. A counseling memorandum dated April 16, 2002, indicated Mark was counseled for preventing the Maintenance Department from operating properly. Mark received a notice of discipline on December 2, 2002, for yelling at Patel: "I know my fucking job," "I don't need anyone to tell me how to put the fucking shelves together," and "if the representative comes, I am off the fucking job."

### D.     Sonja Vilme

Sonja Vilme was a food service worker. She received a notice of discipline dated May 6, 2005, in which she was accused of cursing; leaving her duty station; falsifying an attendance record; walking out of an interrogation; acting inappropriate during a pre-suspension review; and being excessively absent. Vilme had previously received three notices of discipline during 2004. She was terminated after receiving the fourth notice.

### E.     Mary Durandisse

Mary Durandisse was a supervisor described as "loud" and "hyper." Head cook Hoffer testified that Durandisse shouted and screamed at the staff and was very disruptive. No disciplinary action was ever taken against her.

### DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court, and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Grp., Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson v. Liberty Lobby, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible

factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In his complaint, plaintiff asserts that defendants (1) discriminated against him on the basis of his race and color in violation of Title VII; (2) violated his rights under Title VII by retaliating against him after he made complaints concerning discrimination on the basis of race; (3) violated 42 U.S.C. § 1983 by retaliating against him on the basis of his speech; and (4) violated Section 1983 by terminating him without appropriate due process as guaranteed by the Fourteenth Amendment.  Plaintiff also asserts analogous state law claims under the New York State Constitution and the New York Human Rights Law, N.Y. Exec. Law §§ 296 and 297.

## I.  Plaintiff's Section 1983 Claims and New York Human Rights Law Claims Against State Defendants

Defendants first move for summary judgment on the ground that the Eleventh Amendment[3] bars plaintiff's claims under 42 U.S.C. § 1983 and the New York Human Rights Law against states, their agencies, and their officers in their official capacity.  Plaintiff does not respond to defendants' arguments.

It is well settled that Section 1983 does not override the Eleventh Amendment and that a suit against a state or its agency under Section 1983 for damages is barred by the Eleventh

---

[3]        The Eleventh Amendment provides, in pertinent part: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. See Seminole Tribe v. Florida, 517 U.S. 44 (1996); Hans v. Louisiana, 134 U.S. 1, 14-15 (1890).

Amendment unless the state has waived its sovereign immunity. Quern v. Jordan, 440 U.S. 332,

345 (1979); see also Dube v. State University of New York, 900 F.2d 587, 594 (2d Cir. 1990)

("Although Congress is empowered under section five of the Fourteenth Amendment to override

Eleventh Amendment immunity and to enforce by appropriate legislation the substantive

provisions of the Fourth Amendment . . . it is well settled that 42 U.S.C. § 1983 does not

constitute an exercise of that authority."). OMH and RPC are state entities and arms of New

York State. See Santiago v. New York State Dep't of Correctional Services, 945 F.2d 25, 28 n.1

(2d Cir. 1991); N.Y. Mental Hyg. Law § 7.17.

There is also no indication New York State waived its sovereign immunity under the

New York Human Rights Law, and plaintiff points to no such waiver. See Lambert v. New

York State Office of Mental Health, 2000 U.S. Dist. LEXIS 5197, at *20 (E.D.N.Y. Apr. 24,

2000) ("[T]he New York Human Rights Law includes no waiver of the state's immunity to suit

in federal court."), aff'd, 22 Fed. Appx. 71 (2d Cir. 2001).

Therefore, plaintiff can assert no claim against New York State, OHM, or RPC for

violations of Section 1983 or the New York Human Rights Law. These claims are dismissed.

**II.     Plaintiff's Section 1983 Claims Against State Defendants**

Section 1983 authorizes suit only against a "person" who has deprived another of federal

statutory or constitutional rights while acting under color of state law. 42 U.S.C. § 1983. A state

is not a "person" under Section 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71

(1989). In addition, a state agency is not a "person" within the meaning of Section 1983. See

Clissuras v. City Univ. of N.Y., 359 F.3d 79, 81 (2d Cir. 2004) (finding that City University of

New York was "arm of the state" and thus immune from liability under Section 1983); Komlosi

v. New York State Office of Mental Retardation & Developmental Disabilities, 64 F.3d 810, 815

(2d Cir. 1995) (holding state agency cannot be sued under Section 1983). For this additional reason, plaintiff's Section 1983 claims against OHM and RPC are dismissed.

### III.   Plaintiff's Title VII and New York Human Rights Law Claims Against Individual Defendants

Defendants next move for summary judgment on plaintiff's Title VII and the New York Human Rights Law claims against the individual defendants. Plaintiff did not respond to this argument.

An individual supervisor cannot be held liable under Title VII. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) ("[A]n employer's agent may not be held individually liable under Title VII."). This is true even when the supervisor commits discrimination or creates the discriminatory environment. Gibbs v. City of New Haven, 544 F. Supp. 2d 119, 125 (D. Conn. 2008) (addressing ADEA claim). Similarly, the New York Human Rights Law bars claims against individuals who have no ownership interest in the employer and cannot make personnel decisions, unless they contributed to a hostile work environment or aided or abetted discrimination. See Tomka, 66 F.3d at 1317; Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542 (1984); TC v. Valley Cent. Sch. Dist., 2011 U.S. Dist. LEXIS 41486, at *63 (S.D.N.Y. Mar. 30, 2011) ("Individuals may be held liable, however, under section 296(6) for aiding and abetting discrimination by an employer.").

Because plaintiff does not assert a claim for a hostile work environment, the Court dismisses his Title VII claims and Human Rights Law claims against the individual defendants. The Court does not dismiss plaintiff's Human Rights Law claim based on the individual defendants' aiding and abetting discrimination by the RPC at this stage and will address it below.

**IV.    Plaintiff's Title VII Discrimination Claim**

Title VII prohibits an employer from treating an individual less favorably on account of his gender, race, color or national origin. 42 U.S.C. § 2000e-2; Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004). When there is no direct evidence of discrimination, a Title VII claim is analyzed under the shifting burdens described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Plaintiff must first establish a prima facie case of discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). Defendants must then articulate a legitimate, non-discriminatory reason for taking the actions that establish the prima facie case. The reason provided must be both "clear and specific." Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985). If defendants satisfy this requirement, plaintiff must show that defendants' proffered reason is a pretext for discrimination. Plaintiff is not required to prove the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision; rather, he must show that those were not the only reasons and that plaintiff's protected status contributed to the employer's decision. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001). At all times, plaintiff bears the burden of persuading the trier of fact that defendants intentionally discriminated against him. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

Thus, the Court will first consider whether plaintiff has set forth a prima facie case. To establish a prima facie claim of discrimination, plaintiff must demonstrate that (1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Although plaintiff's initial burden is not onerous, he must show that his termination was not made for legitimate reasons. Texas Dep't of Community

19

Affairs v. Burdine, 450 U.S. at 253.  The burden of establishing this prima facie case in employment discrimination cases is minimal.  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).

A plaintiff can prove discrimination through a disparate impact theory.  Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1041 (2d Cir. 1993).  A disparate impact argument is based on the premise "that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination."  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 987 (1988).  To demonstrate a prima facie case under a disparate impact theory, plaintiff must "(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two."  Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 160 (2d Cir. 2001).  These cases tend to focus on statistical disparities, rather than specific incidents.  Cosgrove, 9 F.3d at 1041.  To make out a prima facie case, any statistical disparity must be "sufficiently substantial" to raise an inference of causation.  Smith v. Xerox Corp., 196 F.3d 358, 365 (2d Cir. 1999), overruled on other grounds by Meacham v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir. 2006), vacated, 554 U.S. 84 (2008); Watson v. Fort Worth Bank & Trust, 487 U.S. at 994.

Defendants assert plaintiff cannot demonstrate a prima facie case of discrimination because there is no evidence to support an inference of discrimination.  In his response to summary judgment, plaintiff clarifies that his discrimination claim is based on the distribution of overtime assignments.  Specifically, he alleges overtime assignments were distributed in a manner that discriminated against African-American employees.  In support of his argument, he cites the finding of the New York State Division of Human Rights ("DHR") that there was probable cause to support plaintiff's allegations of discrimination in the assignment of overtime.

20

Plaintiff also contends Patel denied him overtime when it was requested.  Defendants' response
is based on the statistical analysis conducted by Stott.

In finding probable cause, the DHR stated:

> According to Respondent, there are more African-American
> employees than employees from India.  However, as a group
> employees from India worked almost the same amount of overtime
> than African-Americans.   It appears employees from India
> individually work more overtime than African-Americans.

Based on this, the DHR concluded there was probable cause to support plaintiff's claim of
discrimination in the assignment of overtime.[4]

In determining whether a statistical disparity is sufficiently substantial, the EEOC
guidelines provide:

> A selection rate for any race, sex, or ethnic group which is less than
> four-fifths (4/5) (or eighty percent) of the rate for the group with the
> highest rate will generally be regarded by the Federal enforcement
> agencies as evidence of adverse impact, while a greater than four-
> fifths rate will generally not be regarded by Federal enforcement
> agencies as evidence of adverse impact.   Smaller differences in
> selection rate may nevertheless constitute adverse impact, where they
> are significant in both statistical and practical terms . . . .

29 C.F.R. § 1607.4D (2007); Smith v. Xerox Corp., 196 F.3d at 365.  In addition, the Court of
Appeals has indicated a plaintiff can raise an inference of discrimination by showing a
statistically significant disparity of two standard deviations.  Id. (citing Waisome v. Port
Authority of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991)).

Plaintiff has met his burden of identifying a policy or practice pursuant to which
discrimination may have occurred – namely, the distribution of overtime assignments by Patel.

---

[4]     Plaintiff also relies on an audit by the New York State Comptroller.  This audit is
addressed to the provision of overtime generally, not the distribution of it between racial groups
at RPC.  As such, it is not relevant to the issues before the Court.

The operative question is whether there are sufficient facts for plaintiff to demonstrate that a disparity existed in the assignment of overtime between African-American employees and Indian employees, upon which an inference of discrimination may be established

Stott's analysis determined that 18 full-time African-American employees worked overtime on 406 occasions for a total of 2,194.5 overtime hours, while 14 full-time Indian employees worked overtime on 355 occasions for a total of 2,019 overtime hours. African-American full-time employees averaged 22.56 occasions of overtime for 121.92 hours each, while Indian full-time employees averaged 25.36 occasions for 144.21 hours each. Stott concluded these differences were insignificant.

Stott further found that from September 14 to December 12, 2006, thirteen African-American part-time employees worked 2,300 extra-time hours, while ten Indian part-time employees worked 1,591.4 extra-time hours. These totals translated to 176.92 extra-time hours per African-American employee and 159.14 extra-time hours per Indian employee. Finally, Stott noted that in 2006 African-American employees declined overtime or extra-time 37 times, while Indian employees declined overtime or extra-time 23 times.

Plaintiff argues summary judgment is inappropriate because of conclusions drawn from Stott's analysis. However, neither of the measures of statistical significance under Smith create a genuine issue of material fact. First, Stott's analysis determined that African-American employees worked more overtime occasions for a total of more overtime hours. African-American employees also worked more extra-time hours on an aggregate and per employee basis. Thus, as to the number of overtime occasions and average number of overtime hours per employees, the selection rate for African-American employees as compared to Indian employees is greater than the four-fifths threshold denoting significance under Smith. Second, plaintiff has

not offered a statistical expert who can conduct a thorough examination of the statistics to determine standard deviations. As a layperson, the Court cannot and will not perform the necessary calculations. The quantitative evidence is simply insufficient to show that a disparity exists. Accordingly, the Court finds plaintiff has not met his burden of demonstrating a prima facie case of disparate impact under Title VII. See Brown v. Coach Stores Inc., 163 F.3d 706, 712 (2d Cir. 1998) ("[U]nderrepresentation of [a protected group] might result from any number of factors.").

Finally, the Court does not rely on the DHR's finding of probable cause – which is based on a superficial analysis of the distribution of overtime assignments – to conclude that an issue of material fact exists. Such a finding is, by itself, insufficient to defeat summary judgment. See, e.g., Kim v. Columbia Univ., 2010 U.S. Dist. LEXIS 65707 (S.D.N.Y. July 1, 2010) (denying summary judgment because of presence of evidence to create issue of fact, not because of DHR's finding of probable cause); Rouse v. City of New York, 2009 U.S. Dist. LEXIS 46718 (S.D.N.Y. June 2, 2009) (same); see also Paolitto v. Brown E.&C. Inc., 151 F.3d 60, 65 (2d Cir. 1998) (finding it is within Court's discretion whether to admit state agency findings of probable cause).

Plaintiff's Title VII discrimination claim is dismissed.

## V.     Plaintiff's Title VII Retaliation Claim

Plaintiff claims defendants retaliated against him because he complained about racial discrimination at RPC. Specifically, he argues his complaints regarding overtime assignments and his posting of the flyers constituted protected activities under Title VII, and he was punished because of these activities.

Title VII provides "it shall be an unlawful employment practice for an employer to

discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice" by Title VII.  42 U.S.C. § 2000e-3(a).  A Title VII prima facie case of retaliation requires plaintiff to show: (1) he engaged in protected activity; (2) the employer was aware of the activity; (3) the employer took an adverse action against plaintiff; and (4) a causal connection exists between the protected activity and the adverse action.  Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004).  Once plaintiff has established a prima facie case, the burden-shifting paradigm of McDonnell Douglas applies.  If the employer states a legitimate, non-discriminatory reason to justify the adverse employment action, the presumption of discriminatory retaliation is removed and plaintiff is left with the burden of proving that defendants intentionally discriminated against him in retaliation for his protected activity.  See Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir. 1999).  Temporal proximity alone between the protected activity and the adverse employment action is insufficient to establish pretext.  El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010).

In the context of a retaliation claim, an employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Rail Co. v. White, 548 U.S. 53, 68 (2006).  As the Supreme Court in Burlington explained, a court considering material adversity should separate significant from trivial harms.  Oral and written warnings do not generally amount to materially adverse conduct.  Chang v. Safe Horizons, 254 Fed. Appx. 838, 839 (2d Cir. 2007).  The application of the employer's disciplinary policies does not, without more, constitute an adverse employment action.  Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006).

A series of "serious, independent, documented and therefore good faith complaints" by an employer undermines an employee's argument that the employer's decision to terminate him

was a pretext for discrimination. Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010). And if the employer relied upon these complaints in good faith, there is no violation of the employee's rights, even if the complaints turn out to be wrong or inaccurate. Adia v. MTA Long Isl. R.R., 2006 U.S. Dist. LEXIS 51045, at *26 (E.D.N.Y. July 26, 2006). The Court is interested not in the truth of those complaints against plaintiff, but only in what motivated the employer. McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006).

Defendants assert plaintiff was terminated because of his conduct about which RPC received complaints. Specifically, defendants point out threats of violence made by plaintiff, misconduct directed as his superiors, and insubordinate behavior. Plaintiff counters that these reasons are pretextual as evidenced by comparators who acted similarly and were not punished in a similar manner.

### A. Comparators

To succeed through the use of comparators, plaintiff must demonstrate (1) he was treated differently from similarly situated individuals (2) because of his protected activities. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). For employees to be considered similarly situated, they must be similarly situated "in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997). The circumstances of the plaintiff and the individuals need not be identical, but there should be a reasonably close resemblance of facts and circumstances. Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000); see also McGuinness v. Lincoln Hall, 263 F.3d at 54 ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at

least a minimal inference that the difference of treatment may be attributable to discrimination."). The Court determines whether plaintiff and the asserted comparators are similar in significant respects by considering whether the respective individuals were subject to the same performance evaluation and disciplinary standards and engaged in conduct of comparable seriousness without any differentiating circumstances. Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001); Graham, 230 F.3d at 40 ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."); Shumway, 118 F.3d at 64.

On summary judgment, courts also examine the respective employees' seniority and tenure with the employer. See Kearney v. ABN AMRO, Inc., 738 F. Supp. 2d 419, 427 n.1 (S.D.N.Y. 2010); Wang v. N.Y.C. Dept. of Finance, 1999 U.S. Dist. LEXIS 11256, at *62 (E.D.N.Y. July 21, 1999) ("[D]isparity in prior performance history is another differentiating circumstance that defeats [plaintiff's] claim that she was similarly situated to [comparator].").

To determine whether two acts are of comparable seriousness requires the Court to examine "the context and surrounding circumstances in which those acts are evaluated." Graham, 230 F.3d at 40. Whether employees are similarly situated is "[o]rdinarily . . . a question of fact for the jury." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003); Graham, 230 F.3d at 43. If there are so many distinguishing factors between the plaintiff and the comparators, the Court may conclude they are not similarly situated. McGuinness v. Lincoln Hall, 263 F.3d at 54; Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d at 499 n.2 ("[T]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

26

Plaintiff offers Osmond Clarke, Gregory Pittinger, Mark Pittinger, Sonja Vilme, and Mary Durandisse as comparators. Defendants argue that each one is not similarly situated to plaintiff for various reasons. First, defendants contend that each potential comparator had a longer tenure at RPC before being disciplined, while plaintiff began exhibiting disciplinary problems from the beginning of his two years at RPC. Second, defendants assert Mark Pittinger's and Mary Durandisse's conduct did not rise to a comparable level of seriousness to plaintiff's. In addition, defendants recognize that Gregory Pittinger's and Osmond Clarke's conduct was more serious than Mark Pittinger's and Durandisse's, but maintain the conduct was not of comparable seriousness to plaintiff's. Further, the comparators' conduct occurred over a longer time frame than plaintiff's, which was done within a relatively short time frame. Moreover, as to Gregory Pittinger and Osmond Clarke, Gregory agreed to a 12-month disciplinary evaluation period and to attend an anger management program, while Clarke agreed to participate in programs recommended by the Employee Assistance Program. Plaintiff made no such concessions. Finally, defendants point out that Sonja Vilme was terminated.

Under the circumstances present in this case, the Court finds that the comparators are not similarly situated. The Court will address each individual seriatim.

### 1.    Osmond Clarke

The Court finds Clarke not similarly situated to plaintiff for several reasons. First, it is apparent that plaintiff's problems arose soon after he was hired by RPC. Clarke, on the other hand, began working for RPC in 1988, and there is no evidence of any disciplinary problems related to Clarke before 2000. Forman's declaration establishes that RPC quite properly takes length of service into account when making disciplinary decisions. In addition, Clarke's actions were not as serious as plaintiff's. Clarke, unlike plaintiff, did not refuse to cooperate in an

investigation, and he was not disciplined as frequently as plaintiff was in such a short time frame. Finally, Clarke agreed to participate in programs recommended by the Employee Assistance Program, while plaintiff showed no signs of contrition. Context and the employees' particular situations matter when addressing comparators. Here, it leads the Court to conclude Clarke is clearly not similarly situated to plaintiff. A reasonable jury could not find otherwise.

### 2.    Gregory Pittinger

Gregory Pittinger began working for RPC in 1978. Like Clarke, the actions which plaintiff alleges makes Gregory a valid comparator began long after he started at RPC. The first conduct which plaintiff addresses took place in 2002. Additionally, Gregory's conduct did not rise to the same level of seriousness over a short time as plaintiff's did. Lastly, like Clarke, Gregory expressed some responsibility for his actions by agreeing to a disciplinary evaluation period and attending an anger management program. On these facts, a reasonable jury could not conclude Gregory and plaintiff are similarly situated.

### 3.    Mark Pittinger

Mark Pittinger was employed at RPC for 24 years before his first reported discipline. For his actions, he received two notices of discipline and a counseling memorandum. These actions, especially considering their sporadic nature, undermine any conclusion that plaintiff and Mark are similarly situated, and a reasonable jury could not find otherwise.

### 4.    Sonja Vilme

Sonja Vilme received four notices of discipline between January 2004 and May 2005. After receiving the fourth one, Vilme was terminated. Plaintiff argues she was terminated after more warnings than plaintiff received. A review of the facts indicates that any delay in terminating Vilme is not significant to determining whether plaintiff and Vilme are similarly

situated. Vilme received the same discipline as plaintiff and, therefore, cannot serve as a comparator. A reasonable jury could not find otherwise.

### 5.     Mary Durandisse

Finally, as to Mary Durandisse, plaintiff's argument that she received only minimal punishment is unavailing in light of the absence of evidence that her conduct warranted punishment. Plaintiff's evidence shows Durandisse was active and hyper, but does not demonstrate this conduct should have been punished. The nature of her conduct is miles from the conduct for which plaintiff was punished. A reasonable jury could not find her similarly situated to plaintiff.[5]

### B.     Supervisors' Comments

Between May 2006 and September 2006, plaintiff asserts he spoke to James Bopp about the overtime system. Plaintiff claims Bopp expressed animus towards plaintiff for these comments. Further, according to plaintiff, Bopp warned him not to speak during a meeting or Bopp would stop the meeting. Plaintiff denies speaking inappropriately or out of turn at that meeting.

Plaintiff further claims that, in August 2006, he complained to David Carabello, who was Patel's immediate supervisor, about the overtime system. According to plaintiff, Carabello told him, "If I was you, I would be very careful to make sure that I don't become the villain instead of the victim." Plaintiff interpreted this statement as meaning he would be punished for

---

[5]     Because plaintiff did not provide any racial or ethnic information on the comparators, the Court reads the discussion in the papers on the comparators as only addressed to the Title VII retaliation argument and not to a Title VII discrimination claim. See Graham v. Long Island R.R., 230 F.3d at 39 (holding that to be a valid comparator, comparator must be outside relevant protected class).

speaking out against discrimination.

In his declaration, plaintiff represents he spoke to Forman in October 2006 about the overtime assignment system and its alleged discriminatory results as well as the assault by Clarke. In response, plaintiff claims Forman told him that if plaintiff did not stop complaining, he would be terminated within ninety days. According to his deposition, Forman's comment arose after plaintiff had asked Forman a question regarding complaints from Clarke.

To determine the probative value of a derogatory remark, the Court considers (1) who made the remark, (2) when the remark was made in relation to the employment decision at issue, (3) the content of the remark, and (4) the context in which the remark was made. Witkowich v. Gonzales, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008).

Bopp's comments cannot be construed by a reasonable jury as indicating an intent to stifle activities protected by Title VII. Although an individual has a right under Title VII to speak out against unlawful employment practices and discrimination, he does not have the right to do so in any manner he pleases. That is, he cannot be disruptive. Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000) ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise."). Bopp warned plaintiff concerning the manner in which he spoke, not the topic. This goes to the maintenance of an efficient and commotion-free workplace. Therefore, Bopp's comments cannot constitute retaliation.

Carabello's warning to plaintiff to avoid being cast as the villain instead of the victim lacks any indicia that it was intended or would have the effect of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." Thompson v. N. Am. Stainless,

30

LP, 131 S. Ct. 863, 868 (2011) (quoting Burlington N. & Santa Fe Rail Co. v. White, 548 U.S. at

68). A reasonable jury could not conclude this comment has a sufficient connection to

dissuading any protected activities. Cf. Weinstock v. Columbia Univ., 224 F.3d 33, 43 (2d Cir.

2000) (finding that references to plaintiff as "nice" or "nurturing," if made, were not directed to

her gender).

Forman's response to plaintiff's complaints did not concern plaintiff's observations about

discrimination in the assignment of overtime. Rather, as plaintiff testified at his deposition,

Forman's statement was in response to Clarke's comments that plaintiff was complaining to him

too much. This context sheds important light on the meaning of Forman's comment, and it

becomes apparent that Forman was not addressing plaintiff's participation in a protected activity,

but rather plaintiff's interactions with Clarke. Any such comment by Forman cannot constitute

unlawful retaliation. In addition, plaintiff cannot cast the comment in a negative light through

his affidavit in opposition to summary judgment because to do so would contradict his prior

deposition testimony. See Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well

settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony

should be disregarded on a motion for summary judgment.").[6]

As for Gewirtzman's and Forman's objections to the flyers, the Court concludes that

taking offense at plaintiff's offensive flyers does not violate Title VII. The anti-retaliation

provision of Title VII is not a license for offensive, disruptive, rude, or demeaning behavior.

Referring to one's supervisors and employers as "corrupt," "cowardly," "cowards," and "the

---

[6]     Plaintiff addresses incidents involving Yolanda Henny and Maippy Melendez as
supporting his arguments against summary judgment. Other employees' allegations of
discrimination – without agency or judicial findings – do not assist this Court's determination of
whether a reasonable jury could conclude that defendants discriminated against plaintiff.

lowest scum of the planet" is not protected activity; "making charges, testifying, assisting, or participating in enforcement proceedings" is.  42 U.S.C. § 2000e-3(a); <u>Matima v. Celli</u>, 228 F.3d at 79 ("[D]isruptive or unreasonable protests against discrimination are not protected activity under Title VII and therefore cannot support a retaliation claim."); <u>Sumner v. United States Postal Service</u>, 899 F.2d 203, 209 (2d Cir. 1990) ("In addition to protecting the filing of formal charges of discrimination, [Title VII] protects as well informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.").

In sum, no reasonable jury could conclude that plaintiff was discriminated against based on his race or his participation in activities protected by Title VII.  A jury could not find the comparators similarly situated and could not conclude the comments referenced above had any effect of dissuading protected activities.  Nor does the Court find that the reactions to plaintiff's flyer support a cause of action under Title VII in light of the flyers' aggressive, impolite, and offensive tone.

Plaintiff's Title VII retaliation claims are dismissed.

## VI.    First Amendment Retaliation

A plaintiff asserting a First Amendment retaliation claim must offer evidence showing: (1) that the speech was constitutionally protected; (2) that he suffered an adverse employment action; and (3) that the speech at issue was a substantial or motivating factor in the decision. <u>Morrison v. Johnson</u>, 429 F.3d 48, 51 (2d Cir. 2005).  Even if a plaintiff can establish these elements, the defendants may still prevail if they demonstrate that they would have taken the same adverse action in the absence of the protected speech, or that plaintiff's speech was likely

32

to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech. Mandell v. County of Suffolk, 316 F.3d at 383. In addition, "even if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998); see also Waters. v. Churchill, 511 U.S. 661, 681 (1994) (plurality opinion) ("An employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 286 (1977).

For plaintiff's claim to be viable, his speech must have been protected under the First Amendment. Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). Protected speech must be made by plaintiff as a citizen and be on a matter of public concern. Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). If plaintiff did not speak as a citizen or the speech is not on a matter of public concern, he can have no First Amendment retaliation claim. Sousa v. Roque, 578 F.3d 164, 169 (2d Cir. 2009).

The proper inquiry into whether speech was made as a public employee "is a practical one" and "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Garcetti v. Ceballos, 547 U.S. at 424-25. Plaintiff must demonstrate that the speech or associational activity touched on a matter of public concern. Cobb v. Rouse, 363 F.3d 89, 107 (2d Cir. 2004). Whether a public employee's expressive conduct addresses a matter of public concern is a question of law to be determined in light of "the content, form, and context" of the expressive conduct "as revealed by the whole

record." <u>Connick v. Myers</u>, 461 U.S. 138, 147-148 (1983).

Plaintiff's expressions regarding potential racial discrimination at RPC address a matter of public concern. <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83-84 (2004) (defining speech addressing a matter of public concern as "subject of general interest" and "of value and concern to the public"); <u>Connick v. Myers</u>, 461 U.S. at 148 n.8. Racial discrimination in the doling out of assignments in a government facility is addressed to a matter of interest to the public.

To satisfy the adverse employment action requirement, plaintiff must demonstrate "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . ." <u>Zelnik v. Fashion Inst. of Tech.</u>, 464 F.3d 217, 225 (2d Cir. 2006). These actions may include discharge, demotion, reduction in pay or reprimand. <u>See</u> <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999). The inquiry is a "heavily fact-specific, contextual determination." <u>N.Y. State Law Officers Union v. Andreucci</u>, 433 F.3d 320, 328 (2d Cir. 2006). Plaintiff need not show actual chilling, only that the employment action would objectively deter a similarly-situated individual of ordinary firmness. <u>Zelnick</u>, 464 F.3d at 226 n.2. Here, plaintiff was terminated. This qualifies as an adverse action.

Finally, plaintiff must demonstrate a causal connection between plaintiff's speech and the adverse employment action. He can establish such a connection indirectly "by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." <u>Cobb v. Pozzi</u>, 363 F.3d 89, 108 (2d Cir. 2003) (quoting <u>Morris</u>, 196 F.3d at 110). But plaintiff must produce actual evidence of his version of the story and not merely conclusory statements. <u>See</u> <u>Morris</u>, 196 F.3d at 111.

Once plaintiff demonstrates his speech is on a matter of public concern, the Court conducts the balancing test set forth in <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568

34

(1968), and weighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." A public employer may terminate an employee for speaking on matters of public concern if "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995). As a plurality of the Supreme Court held in Waters v. Churchill, 511 U.S. at 680-81, "[d]iscouraging people from coming to work" and "unkind and inappropriate" language which threatens to "undermine management's authority" qualify as language which disrupts the workplace. See also Rankin v. McPherson, 483 U.S. 378, 388 (1987). Offensive language which is not conducive to "cooperative conflict resolution" also undermines the quality of the workplace and is not protected. Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir. 2008) (addressing disruption to school learning environment).

Plaintiff complained of discriminatory practices, which qualifies as speech of a public concern. He did so, however, in a threatening, rude, and offensive manner that defendants could have reasonably concluded would create a disruption at RPC. Even if the flyers did not actually lead to a disruption among employees, their language and tone created a reasonable belief among Forman and the other supervisors that they would disrupt the efficient operations of the workplace. See Heil v. Santoro, 147 F.3d at 109. The First Amendment is not a license for rude or threatening speech directed at an employee's supervisors, and an employer need not wait for a disruption. Plaintiff's First Amendment claim based on the flyer is dismissed.

Plaintiff also alleges he was punished because of his comments about food safety issues.

Defendants charge that these comments were made as part of plaintiff's job duties.  In Garcetti v. Ceballos, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  547 U.S. at 421.  Thus, if plaintiff's speech was required by his job as a food-service worker, then his statements are not protected speech.  If not, the Court must consider whether these statements addressed a matter of public concern.  Connick, 461 U.S. 138.

Whether an employee spoke "pursuant to" his job duties is an objective, practical inquiry. Garcetti, 547 U.S. at 424; Weintraub v. Bd. of Educ., 593 F.3d 196, 202 (2d Cir. 2010).  The "pursuant to" inquiry turns on whether the speech "owes its existence to a public employee's professional responsibilities."  Garcetti, 547 U.S. at 421; Weintraub, 593 F.3d at 202.  In construing an employee's job duties, the Garcetti Court cautioned that:

> [f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

Garcetti, 547 U.S. at 424-25.  Rather, courts have found that speech pursuant to official duties or "in furtherance of such duties" qualifies.  See Weintraub, 593 F.3d at 202.  In Weintraub, the Court of Appeals concluded that a public employee spoke pursuant to his official job duties when his speech was "part-and-parcel of his concerns" about his ability to "properly execute his duties."  Id.  The Court did not mandate the speech be "required by, or included in, the employee's job description, or in response to a request by the employer."  Id.

Plaintiff's specific job duties were undefined and ambiguous.  Nonetheless, ensuring

food safety was part of the broadly-defined responsibilities he had as a food service worker. Plaintiff's complaints of rotten and stale food were made pursuant to those duties. See Brantley v. Unified Sch. Dist. No. 500, 2009 U.S. Dist. LEXIS 55718 (D. Kan. June 24, 2009) (holding employee who delivered food made comments regarding rotten food pursuant to his job duties), aff'd, 405 Fed. Appx. 327 (10th Cir. 2010). As such, he cannot base a First Amendment retaliation claim on that speech. It will be dismissed.

Finally, any actions by Clarke cannot constitute retaliation under the First Amendment. For a government employee's conduct to be actionable under Section 1983, he must have been acting under the color of state law. An individual acts under the color of state law when he "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997) (quoting Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996)); see also Banisaied v. Clisham, 992 F. Supp. 128, 130 (D. Conn. 1998) (When the employee is "engaged in the pursuit of private interests," he is not acting under the color of state law.). "Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law." Kern v. City of Rochester, 93 F.3d at 43.

When Clarke allegedly assaulted plaintiff, threatened to get him fired, and filed a criminal complaint, Clarke was not acting under the color of law. His actions were based on the pursuit of his private interests and were not made possible solely because of his position as a public servant. Clarke acted as an employee and plaintiff's coworker. Therefore, Clarke cannot be liable under Section 1983.

**VII. Due Process Claim**

Defendants have moved for summary judgment on plaintiff's due process claim

contained in count four of the complaint.  In it, plaintiff alleges he was terminated without

appropriate pre-termination or post-termination hearings and procedural protections.  Plaintiff

did not respond to this argument.  Therefore, the Court deems it abandoned and dismisses it.  See

Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem

a claim abandoned when a party moves for summary judgment on one ground and the party

opposing summary judgment fails to address the argument in any way.").

In any event, this claim has no merit.  The availability of an adequate remedy under New

York law to challenge his termination in an Article 78 proceeding satisfies plaintiff's

constitutional right to due process.  See Glicksman v. N.Y. City Envtl. Control Bd., 2008 U.S.

Dist. LEXIS 7369, at *11-13 (S.D.N.Y. Jan. 25, 2008), aff'd, 345 Fed. Appx. 688 (2d Cir. 2009).

## VIII.   State Law Claims

The Court did not dismiss plaintiff's aiding and abetting claim under the New York

Human Rights Law above.  Because the Court now concludes that plaintiff was not

discriminated against based on his race or retaliated against based on his actions, there can be no

claim that any individual employees violated his state law rights.

The aiding and abetting claim is dismissed.

## IX.   Qualified Immunity

Defendants argue they are entitled to qualified immunity for their actions.  Qualified

immunity shields government officials whose conduct "does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects

"all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475

U.S. 335, 341 (1986).

The test for qualified immunity is twofold.  A qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).  The Court must consider whether the constitutional right was clear enough so that a reasonable official would understand that her actions would violate that right. Saucier v. Katz, 533 U.S. 194, 201 (2001).

The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular . . . conduct." Saucier v. Katz, 533 U.S. at 205.  Qualified immunity applies if the officials' mistake as to what the law requires is reasonable. Id.  It does not apply if, on an objective basis, it is obvious that no reasonably competent official would have taken the actions of the alleged violation. Malley v. Briggs, 475 U.S. at 341.  Summary judgment is appropriate when a trier of fact would find that reasonable officials could disagree on the legality of defendants' actions. Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

If the Court assumes, arguendo, that plaintiff's rights were violated, it becomes necessary to determine whether a clearly established right was violated by defendants' conduct. See Saucier v. Katz, 533 U.S. at 207-08 ("[W]e will assume a constitutional violation could have occurred under the facts alleged . . . , then proceed to the question whether this general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances this officer faced.").

Because the Court has concluded that there were no violations of plaintiff's rights, it need not reach the issue of qualified immunity.  However, even if there was a disputed issue of fact as to whether plaintiff's rights were violated, the Court would find that defendants are entitled to qualified immunity.  Reasonable officials could disagree as to whether defendants' actions

violated plaintiff's rights under the First Amendment and Title VII.  Reasonable officials could conclude it was objectively reasonable for defendants to terminate plaintiff because of his conduct, including his threats against other employees, his flyer, his failure to comply with supervisors' instructions, and other actions in the workplace.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. #49) is GRANTED.

The Clerk is instructed to terminate the pending motion and to close this case.

Dated: October 6, 2011
      White Plains, New York

SO ORDERED:

Vincent L. Briccetti
United States District Judge

40